IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NOBLE ENERGY, INC.,         )
                                   )
        Plaintiff,        )
                                   )
     v.                )     Civil Action No. 08-2023 (RJL)
                                   )
KENNETH L. SALAZAR, Secretary, )
United States Department of    )
the Interior, *et al.*,          )
                                   )
        Defendants.      )

## MEMORANDUM OPINION
(March 4, 2010) [#18 and 24]

Over two years ago, the Interior Board of Land Appeals ("IBLA"), an

administrative appeals board in the U.S. Department of the Interior ("DOI"), set aside a

decision by the Pacific Regional Director ("the Regional Director") of the Mineral

Management Service ("MMS") to exclude a total of four oil and gas leases from two

Outer Continental Shelf ("OCS") units off the coast of California.  The IBLA determined

that the record did not support the Regional Director's conclusory findings, so it appointed an Administrative Law Judge ("ALJ") to conduct an independent evidentiary hearing. Ultimately, the IBLA concluded that the ALJ's findings supported exclusion of the leases, notwithstanding that the Regional Director had made his unsubstantiated decision based on an improper political motivation. Plaintiffs Aera Energy LLC ("Aera") and Noble Energy, Inc. ("Noble") are the lessees of the excluded leases, and they bring this consolidated action under the Administrative Procedure Act ("APA") to set aside the IBLA's decision on the ground that once the ALJ uncovered the improper political motivation, the IBLA should have reversed the exclusion decision. I disagree. Because whatever legal error the IBLA committed neither prejudiced the plaintiffs nor undermined the merits of the IBLA's ultimate decision, I have concluded that the agency action must stand. Accordingly, the Court DENIES the Plaintiffs' Motion for Summary Judgment and GRANTS the Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

I.    **Statutory Background**[1]

A.    **The Outer Continental Shelf Lands Act ("OCSLA")**

The OCSLA, 43 U.S.C. §§ 1301 *et seq.*, empowers the Secretary of the Interior to

---

[1] Unless otherwise indicated, the Court follows the citation protocol adopted in the agency decision under review. All references to regulations are to the regulations in effect at the time of the agency's decision to exclude the leases at issue in this lawsuit. *See In re Samedan Oil Corp.*, 173 IBLA 23, 31 n.8 (2007); (AR 02989 n.8).

sell and administer oil and gas leases on the OCS. The statute defines the OCS as those lands within federal jurisdiction lying seaward of state jurisdiction. *Id.* § 1331. The Secretary has delegated much of this authority to MMS. 30 C.F.R. § 250.104. The Pacific Regional Office of the MMS, which is headed by the Regional Director, has specific responsibility for administering OCS leases offshore of California. (AR 02251).

An OCS lease gives the lessee an exclusive right "to explore, develop and produce the oil and gas contained within the leased area." 43 U.S.C. § 1337(b)(4). The lease has an initial term of either five or ten years and will continue in effect thereafter so long as the lessee produces oil or gas in paying quantities or conducts approved drilling or well reworking operations on the lease. *Id.* § 1337(b)(2). To further extend the lease term, lessees may request a suspension of the lease "to facilitate proper development." *Id.* §§ 1334(a)(1); 1337(b)(5).

## B.    Unitization And Unit Adjustment[2]

Upon request, the Regional Director may join leases into "units" if doing so would "[p]romote and expedite exploration and development" or "[p]revent waste, conserve natural resources, or protect correlative rights, including Federal royalty interests, of a reasonably delineated and productive reservoir." 30 C.F.R. § 250.1301(a). The Regional

---

[2] The unitization regulations were originally codified at 30 C.F.R. § 250.50. These regulations were subsequently amended in 1997 and are now codified at 30 C.F.R. §§ 250.1300–250.1304. When promulgating the amendments, the MMS made clear that it did "not intend any substantive changes to the regulations." Unitization, 62 Fed. Reg. 5329, 5329 (Feb. 5, 1997).

3

Director may also compel the joinder of leases into units if necessary to "[p]revent waste"; "[c]onserve natural resources"; or "[p]rotect correlative rights, including Federal royalty interests." *Id.* § 250.1301(b). A unit includes "the minimum number of leases that will allow the lessees to minimize the number of platforms, facility installations, and wells necessary for efficient exploration, development, and production of mineral deposits, oil and gas reservoirs, or potential hydrocarbon accumulations common to two or more leases." *Id.* § 250.1301(c). A lease that is subject to a unit agreement remains in effect beyond the initial term of the lease so long as drilling, production, or other operations continue the unit in effect. *Id.* § 250.1301(g).

After exploration has been completed, an adjustment of the unit area may be warranted. Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 45 Fed. Reg. 29280, 29281 (May 2, 1980). "In keeping with the minimum area standard, the portions of leased areas that do not overlie the more precisely delineated reservoir should be excluded from the unit area in an adjustment." *Id.* The agreements governing the two units at issue in this case specifically provide for "contraction of the Unit Area when such contraction is necessary or advisable to conform with the purposes of [the Unit] Agreement." (AR 0376; AR 0578). Both agreements state that the unitization of the oil and gas interests in the unit area serves the purpose of "conservation, prevention of waste, and protection of correlative rights." (AR 0366; AR 0572). Unit adjustment may be initiated by the Unit Operator—that is, the lessee appointed by the unit agreement to

4

manage unit operations—or by the Regional Director.  (AR 0376-77; AR 0578).  The relevant unit agreements also provide for the automatic exclusion of a lease from an already-formed unit if the lease does not contribute to production within ten years after the unit commences production.  (AR 0381; AR 2049).  If a lease is excluded from the unit for any reason, then the lease terminates unless the initial term of the lease has not expired, operations have commenced on the lease, or MMS approves a suspension for the lease.  30 C.F.R. § 250.1301(f).

## II.     Factual Background[3]

### A.     Aera's Excluded Leases: Leases 420, 424, 429

In June 1986, MMS approved the formation of the Santa Maria Unit ("SMU"), which consisted of eight leases, each of which MMS issued in 1981 for a primary term of five years.  (AR 0009; AR 2962; AR 3420; AR 3435; AR 5641; AR 8037).  Among the eight leases that comprised the SMU were three of the leases at issue in this lawsuit: leases 420, 424, and 429.  (AR 2962; AR 8036).  Before formation of the SMU, Aera drilled four exploratory wells on leases in the SMU area, one of which was drilled on lease 424.  (AR 8037; AR 8574; AR 8576; AR 8578; AR 8585).  None of the wells, including the well on lease 424, were deemed to be capable of producing oil or gas in paying quantities.  (AR 8574; AR 8576; AR 8578; AR 8585).  Nonetheless, given the

---

[3] For ease, all references to Aera and Noble include their corporate predecessors in interest.

available geological information, the Regional Director concluded that the submerged lands covered by the eight leases within the SMU area were "logically subject to unitized operations." (AR 2162). Immediately after the SMU was approved, Aera drilled a well on lease 434, which unlike the others proved to be capable of producing oil or gas in commercial quantities. (AR 8584).

From October 1986, when the initial terms of the leases expired, through June 1994, Aera sought, and MMS granted, a series of requests to suspend operations in the SMU. (AR 0256; AR 0261; AR 0265-66; AR 0268-69; AR 2962). Also, in late 1992, MMS requested that Aera participate in the California Offshore Oil and Gas Energy Resources ("COOGER") Study. (AR 0285; AR 0289). Aera agreed, and as a result, its leases in the SMU remained suspended until August 1999. (AR 0289; AR 0293-94; AR 0297; AR 0314; AR 0317; AR 0325). During these suspensions, Aera drilled no additional wells. (*See* AR 4268; AR 4324).

Anticipating the conclusion of the COOGER Study, MMS advised Aera in December 1998 to submit a request for a suspension of operations that would take effect when the MMS-directed suspensions expired. (AR 2156-57). Failure to do so, of course, would result in the termination of Aera's leases, so Aera requested an additional suspension in May 1999. (AR 3290-97). As part of its request, Aera proposed that the entire Offshore Santa Maria Basin ("OSMB"), which included the SMU, be re-unitized into one or two units in order to minimize the number of drilling platforms. (AR 3293;

6

AR 3295-96).  In response, MMS advised Aera in June 1999 that it would also consider whether to adjust the SMU so as to exclude non-producing leases.  (AR 2963; AR 3346; AR 6237-39; AR 8645).  The following month, Aera representatives met with MMS officials to discuss Aera's suspension request and to discuss whether unit contraction was warranted.  (AR 2963; AR 3061; AR 3376; AR 3552; AR 3558).

Soon thereafter, in August 1999, MMS announced its decision by letter to Aera. In the letter, the Regional Director concluded "that the geological and geophysical data and interpretation no longer support inclusion of Leases OCS-P 0420, 0424 and 0429 within the Santa Maria Unit."  (AR 0102).  As a result, those leases expired, but for the remaining five leases in the SMU, the Regional Director approved the requested suspension of operations.  (AR 0102-03).

### B.    Noble's Excluded Lease: Lease 462

Noble obtained lease 462 in 1982 and leases 460, 464, and 465 in 1987.  (AR 3621).  In July 1987, MMS approved the unitization of three of the four leases—460, 462, and 464—into the Gato Canyon Unit ("GCU").  (AR 0665-66).  At the time the GCU was formed, a test well capable of producing oil or gas in commercial quantities had already been drilled on lease 460.  (AR 3621).  In 1989, Noble drilled a second well on that lease. (AR 3622).  It too proved capable of producing hydrocarbons in paying quantities.  (*Id.*).

No additional wells have been drilled on the GCU.  (*See* AR 8740).  From 1987 until 1994, MMS approved a series of requests by Noble to suspend operations on the

unit.  (AR 0665-66; AR 0668; AR 0671-72; AR 0675).  Like Aera, Noble also agreed in late 1992 to participate in the COOGER Study, the suspension for which lasted until June 1999.  (AR 0297-98; AR 0679-90; AR 0694-97; AR 0702-04; AR 3620).  Before the COOGER Study concluded, MMS advised Noble, just as it had advised Area, that lessees needed to submit a request for additional suspensions to take effect when the COOGER suspension ended.  (AR 2156-57).  In May 1999, Noble filed its request for a three-year suspension of operations on the GCU.  (AR 8303).  MMS approved a temporary suspension until August so that it could review Noble's request.  (AR 0705-06).  It also informed Noble that it would consider whether to eliminate leases from the unit.  (AR 5346; AR 6237; AR 6239; AR 6255).  Representatives of Noble met with MMS officials in July to discuss the suspension request and to discuss whether unit contraction was necessary.  (AR 3860-61).

Unpersuaded by Noble's presentation, the Regional Director decided in August 1999 that "the geological and geophysical data and interpretation no longer support inclusion" of lease 462 within the GCU.  (AR 0092-93).  As a result, lease 462 terminated, even though MMS later approved a suspension of operations for the remaining leases in the GCU.  (AR 0707-08).

C.     The IBLA's Decision

Aera and Noble independently appealed the Regional Director's unit adjustment decisions to the IBLA.  (AR 0067; AR 0071).  They argued, among other things, that both

8

decisions should be "reversed as a matter of law" because those decisions had been "unduly tainted by impermissible political considerations." (AR 3108-09; AR 3680-81). The IBLA consolidated the appeals and then set aside the Regional Director's decisions because the record did "not establish the basis for MMS' conclusory findings . . . that the 'geophysical data and interpretation no longer support inclusion' of the excluded leases within their respective units." *In re Samedan Oil Corp.*, 163 IBLA 63, 69 (2004). Given the inadequacy of the factual record, the IBLA referred the case to an administrative law judge for an independent evidentiary hearing.[4] *Id.* at 71.

At the hearing, which the ALJ conducted in mid-2005, the Regional Director, Dr. J. Lisle Reed, testified about the effect of political influence on his decision to exclude the four leases in this case. He testified that his immediate supervisor told him that it "would be politically very important to cancel some of the tracts" as a show of "good faith to California officials." (AR 2289). The supervisor also said that excluding the four leases "would help her in carrying on the credibility of the region and her work in Washington" and, in particular, that it would "appease[]" California politicians. (AR 2335-37). More importantly, the Regional Director admitted that absent the involvement of his supervisor, which he characterized as politically motivated, he would *not* have

_____

[4] As a technical matter, the IBLA did not actually "set aside" the Regional Director's decision for purposes of finality because it retained jurisdiction of the appeal until it took dispositive action based on the ALJ's proposed findings of fact. (*See* AR 2891-2907).

9

decided to exclude the four leases from their respective units:

> Q.     [H]ad Herndon [i.e., MMS Headquarters] not involved itself in the
>        decision-making, your testimony is that you would have allowed the
>        leases to stay in the units, correct?
>
> A.     Yes, uh-huh.

(AR 2342; *see also* AR 2290 (testifying "take out the politics," and the excluded leases

would have been preserved)).  Amazingly, the Regional Director confirmed that he would

have preserved the leases even though he admitted that his staff's conclusion that the

geological data no longer supports inclusion of those leases was *correct* given the

scenario presented.  (AR 2338-39).[5]

In a detailed report numbering more than a hundred pages, (AR 9941-10053), the

ALJ made findings that the IBLA adopted in their entirety.  The IBLA concluded "that

those factual findings, the parties' submissions, and the record as a whole establish that

the leases were properly excluded from the units because they lack the potential

hydrocarbon accumulations necessary for continued inclusion in the units." *In re*

---

[5] According to the ALJ's findings, the Regional Director believed that the data was
"susceptible to different interpretations" and that a "plausible interpretation" supported
the continued inclusion of the leases in their respective units.  (AR 9962).  Even though
the Regional Director acknowledged that the excluded leases were "marginal," he would
have maintained those leases because exclusion would result in lost rental revenue for the
Government, as well as a lost opportunity for future development of possible hydrocarbon
accumulations given the unlikelihood of ever re-leasing the excluded tracts.  (AR 9963).
The ALJ, however, discounted the Regional Director's reasons for keeping the leases
because it found no rule or policy permitting unitization on grounds that the Government
might lose rental income or that the excluded tracts might not be re-leased for many years
later.  (*Id.*).

*Samedan Oil Corp.*, 173 IBLA 23, 25 (2007); *see also id.* at 44 n.16 (noting its finding

that "none of the excluded leases on the GCU and the SMU contains a potential

hydrocarbon accumulation"). As for the plaintiffs' argument that the Regional Director's

decision must be reversed because it was improperly influenced by political

considerations, the IBLA acknowledged that agency action tainted by those

considerations is invalid but nevertheless drew upon the well-established principle that if

the decision-making process is insulated from political influence, courts need not set

aside the agency action. *Id.* at 38. Applying this principle to the ALJ's factual findings,

the IBLA noted that even though the Regional Director was motivated by political

considerations, the merits of his decision were nonetheless supported by the data and the

analysis of his staff who were *not* influenced by any improper political considerations. *Id.*

Accordingly, the IBLA concluded that "the decision-making process and the actual

decision-makers were sufficiently insulated from the political pressure to obviate the need

to set aside MMS's decisions." *Id.* Ultimately, the IBLA held that "the record developed

during the hearing process clearly supports MMS's decisions to exclude the leases from

their respective units." *Id.*

### STANDARD OF REVIEW

Under the APA, a reviewing court must "hold unlawful and set aside agency

action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). Because the

plaintiffs' challenge is, in essence, a legal one and because the legal question does not

involve the IBLA's interpretation of a statute that it administers, the Court owes the agency no particular deference on the question now before it. The Court is mindful, however, that not every legal error entitles a plaintiff to relief. Indeed, the APA provides that "due account shall be taken of the rule of prejudicial error." *Id.* § 706. Thus, the question before the Court is whether the IBLA's actions—(1) to set aside the Regional Director's decision and appoint an ALJ to conduct an independent evaluation of the evidentiary basis for excluding the leases; and (2) to decide, based on the ALJ's findings, that exclusion was supported by the evidence—merit reversal by this Court based on the IBLA's erroneous, but harmless, analysis regarding the legal effect of the Regional Director's improper political motivation. For the following reasons, the answer is no.

## DISCUSSION

Agency action must be set aside, of course, if found to be motivated in whole or in part by political pressures. *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1972). "The test is whether 'extraneous factors intruded into the *calculus of consideration*' of the individual decisionmaker." *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 170 (D.C. Cir. 1983) (quoting *Volpe*, 459 F.2d at 1246). In short, agencies must make their decisions "based strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes." *Volpe*, 459 F.2d at 1246. This rule exists for the obvious reason that "[political] interference so tainting the administrative process violates the right of a party

to due process of law." *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994).

What makes this case unusual, however, is that the IBLA actually set aside the Regional Director's decision for insufficient evidence and appointed an ALJ to conduct an independent factual inquiry.  During that inquiry, the Regional Director testified that his decision had been motivated by political considerations.  At issue, therefore, is the legal consequence, if any, of the IBLA's decision to discount the Regional Director's admission of political influence based on a finding "that the decision-making process and actual decision-makers were sufficiently insulated from the political pressure." *In re Samedan Oil Corp.*, 173 IBLA at 38.

Apparently, the IBLA's finding was predicated on its determination that the "actual" decision-maker was the Regional Director's staff, not the Regional Director himself.  Indeed, the IBLA made a point to emphasize that the Regional Director "did not review or evaluate the data himself, but relied on the analysis of his staff who were not instructed that the excluded leases needed to be terminated or that any particular result was desired." *Id.*  The IBLA also noted that the "technical staff was more qualified than [the Regional Director] by training and relative familiarity with the relevant data to render an opinion on whether the leases should have been removed from the units." *Id.*  Because the ALJ found that the staff had not been exposed to any political pressure, the IBLA concluded that the decision to exclude the leases was not so tainted as to be invalid. *Id.*

13

Unfortunately, I disagree with this reasoning.

As a fundamental legal matter, the Regional Director (not his staff) was the "actual" decision-maker.  The SMU and GCU agreements specifically provide, for instance, that unit contractions "shall be initiated by the Unit Operator after preliminary concurrence of the *Regional Supervisor* or on demand of the *Regional Supervisor*."  (AR 0376-77; AR 0578 (emphasis added)).  In the factual findings that the IBLA adopted, the ALJ characterized the Regional Director as "the MMS decisionmaker," (AR 9946), and the Regional Director effectively acknowledged his role as the decision-maker when he told the ALJ that he would have retained the leased units absent his superior's influence, (AR 2342).

Although the IBLA thought it significant that the Regional Director relied on the analysis of his technical staff, such reliance is hardly surprising.  Nor is it surprising that the staff might have greater expertise and familiarity with the data than the Director.  That the Regional Director relied on a staff with greater expertise does not render him a mere figurehead.  Neither the IBLA in its opinion nor the defendants in this suit have pointed to any authority for the proposition that the Regional Director's duty is to rubberstamp his staff's recommendations.  Stated simply, the Regional Director's role is not a ministerial one, and the defendants have not presented any authority or evidence to the contrary.

Because the Regional Director was the "actual" decision-maker both as a matter of law and as a matter of fact and because he admitted that his decision to exclude the four

14

leases was motivated by political influence, the IBLA's conclusion that the Regional

Director's decision-making process and the actual decision-makers were sufficiently

shielded from that influence is inaccurate and thus contrary to law.  Notwithstanding this

erroneous legal conclusion, however, the IBLA did determine, based on the ALJ's

independent factual inquiry, that the facts warranted exclusion of the leases.  In fact, the

IBLA specifically held that "the record developed during the hearing process clearly

supports MMS's decisions to exclude the leases from their respective units." *In re*

*Samedan Oil Corp.*, 173 IBLA at 38.  The issue now before this Court is whether the

IBLA's legal error has actually prejudiced the plaintiffs.  It has not.

By setting aside the Regional Director's decision and seeking an independent

evaluation of the basis for exclusion, the IBLA effectively removed whatever undue

political influence had tainted the agency's decision-making process.  Under the APA,

this Court need not set aside agency action unless the agency commits an error that causes

prejudice.  5 U.S.C. § 706; *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

Here, the IBLA's error is not prejudicial to the plaintiffs because the IBLA ultimately

found that the factual record compiled by the ALJ—who was free of any political

influence—amply supported elimination of the four leases.  Specifically, the IBLA held

that those leases were properly excluded because the ALJ's factual findings show that

they do not contain potential hyrdrocarbon accumulations.  *In re Samedan Oil Corp.*, 173

IBLA at 38-44.[6]  Indeed, no one alleges that the IBLA or the ALJ were exposed to the political pressures that tainted the Regional Director's decision.  Therefore, by referring the case to an unbiased ALJ for an independent evidentiary hearing, the IBLA severed whatever nexus existed between the improper political pressure and the agency's final decision to exclude the leases.

Because the ALJ found that improper political considerations had intruded into the Regional Director's decision, the plaintiffs contend that the IBLA, as the appellate body charged with reviewing the Regional Director, should have automatically set aside that decision and adopted the decision that the Regional Director testified he would have otherwise reached.  Moreover, they contend that the IBLA is powerless to "substitute its judgment for that of the [agency] official duly authorized to exercise the discretion."  *In*

---

[6] The plaintiffs do not argue in their summary judgment briefing that the IBLA's conclusions about the propriety of excluding the leases are arbitrary, capricious, or unsupported by the evidence.  Instead, they argue that the decision the Regional Director would have reached absent the political influence is a reasonable one and should have been adopted by the IBLA as a matter of law.  Because the plaintiffs have not presented any argument challenging the reasonableness of the IBLA's judgment that the facts support exclusion of the leases, the plaintiffs have abandoned the claims set forth in Counts 2, 3, and 4 of the Aera Complaint, (Aera Complaint [#1] at 23-29), and Counts 2 and 3 of the Noble Complaint, (Noble Complaint [#1] at 21-25).  *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995) (holding that an argument not raised by a party in its motion for summary judgment is waived).

*re Center for Biological Diversity*, 162 IBLA 268, 288 (2004).[7] Because the Regional

Director has discretion to exclude unit leases, the plaintiffs question whether the IBLA

can exercise that discretion in lieu of the Regional Director based on its own independent

assessment of the facts.[8]  Of course, it can.[9]

---

[7] *See also In re Acadia Mountain Guides, Inc.*, 173 IBLA 1, 9 (2007) (stating that
the IBLA "will not ordinarily substitute [its] judgment for that of BLM officials delegated
the authority to exercise discretion"); *In re Pronto Pics, Inc.*, 165 IBLA 90, 92 (2005)
(explaining that the IBLA "will not ordinarily substitute [its] judgment for that of BLM
officials delegated the authority to exercise discretion merely because there is more than
one legitimate point of view on a subject"); *In re Naslund*, 79 IBLA 252, 254 (1984)
("The Board will not substitute its judgment for that of BLM.").

[8] To be clear, the Regional Director does not have unfettered discretion to initiate
unit contraction.  Indeed, if that were the case, then this Court would not have jurisdiction
over the plaintiffs' claims, because the APA precludes judicial review of agency action
that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  Neither party
seriously makes that argument.  Furthermore, the plaintiffs' argument emphasizing that
the Regional Director's authority is discretionary calls into doubt their claim that political
influence deprived them of due process of law.  That an agency decision-maker relies on
political considerations only matters to the extent that the decision is governed by
statutory or regulatory standards.  Due process concerns only arise when an agency makes
decisions based on "considerations not made relevant by Congress in the applicable
statutes." *Volpe*, 459 F.2d at 1246.  In this case, however, there are meaningful legal
standards that would make the consideration of political factors improper.  For instance,
regulatory guidance issued by MMS makes clear that unit contraction should be initiated
for "the portions of leased areas that do not overlie the more precisely delineated
reservoir." Oil and Gas and Sulfur Operations in the Outer Continental Shelf, 45 Fed.
Reg. at 29281.  In addition, the SMU and GCU agreements specifically provide for unit
contraction when "necessary or advisable to conform with the purposes of [the]
Agreement," (AR 0376; AR 0578), which include "conservation, prevention of waste,
and protection of correlative rights," (AR 0366; AR 0572).

[9] Perhaps the plaintiffs cling to their position so vigorously because they are
advocating that the geologically erroneous decision the Regional Director said he would
have made absent the political influence be adopted by this Court.

17

Notwithstanding the plaintiffs' claims, the law fairly establishes that the "IBLA has de novo review authority over [the] decisions" of subordinate decision-makers. *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000). Particularly instructive is 43 C.F.R. § 4.1, which provides that the IBLA, as a component of DOI's Office of Hearings and Appeals, "is an authorized representative of the Secretary for the purpose of hearing, considering and determining, as fully and finally as might the Secretary, matters within the jurisdiction of the Department involving hearings, and appeals and other review functions of the Secretary." In furtherance of its duties as the Secretary's representative, the IBLA "may, on its own motion, refer any case to an administrative law judge for a hearing on an issue of fact." *Id.* § 4.415. Because the IBLA can authorize independent fact-finding by an ALJ and thereby assume the power of de novo review, the IBLA has no obligation to defer to the Regional Director.

Although, as a general matter, the IBLA has refrained from substituting its judgment for that of the decision-maker charged with exercising discretion in the first instance, it has not categorically foresworn its authority to do so. For instance, in *In re Center for Biological Diversity*, the IBLA explained that it "will not *ordinarily* substitute its judgment for that of the . . . official duly authorized to exercise the discretion *where the basis for that decision is clearly set forth in the decision and the record before [the decision-maker]*." 162 IBLA at 288 (emphasis added). The clear inference to be drawn from this statement is that the IBLA *will* indeed substitute its judgment for that of the

subordinate decision-maker, as it has authority to do, where the basis for the decision is *not* clearly set forth in the decision itself or in the administrative record. That is precisely what occurred here.

On appeal, the IBLA held that the record did not establish the basis for the Regional Director's "conclusory findings." *In re Samedan Oil Corp.*, 163 IBLA at 69. As a consequence, the IBLA set aside the Regional Director's unit adjustment decision and referred the case to an ALJ for an evidentiary hearing. *Id.* at 71. The IBLA's decision to authorize an independent evidentiary hearing based on the inadequacy of the Regional Director's findings makes clear that the ALJ's mandate went far beyond determining the nature and scope of the alleged political influence and underscores that the IBLA intended to conduct a de novo review of the merits. Based on the ALJ's findings, the IBLA reached its own conclusion "that the leases were properly excluded from the units because they lack the potential hydrocarbon accumulations necessary for continued inclusion in the units."[10] *In re Samedan Oil Corp.*, 173 IBLA at 25. Given the

---

[10] That the ALJ was "require[d], when faced with competing expert opinions, to give deference to the professional opinion" of the experts upon which MMS relied does not establish, as the plaintiffs contend, that the review undertaken by the IBLA was not de novo. (Pl. Reply [#29] at 10 (quoting the ALJ at AR 9947)). As the IBLA has said before, "even where the Board exercises its full de novo review authority, the Board, as does the Secretary, has the right to rely on the reasoned conclusions of the Department's technical experts." *In re Sun Oil Co.*, 91 IBLA 1, 22 (1986). Notably, the fact that both the ALJ and the IBLA deferred to MMS's technical experts did not improperly taint the IBLA's de novo review of the Regional Director's decision because the ALJ specifically found that those experts had not been influenced by political considerations. (*See* AR 9962).

IBLA's authority to stand in the shoes of the Secretary and to review decisions de novo when it finds that those decisions are not properly supported, the IBLA committed no legal error by proceeding in the manner in which it did.

## CONCLUSION

Notwithstanding the IBLA's erroneous legal conclusion that the Regional Director's decision-making process and the "actual" decision-makers were sufficiently shielded from improper political influence, the Court is satisfied that this analytical "error," such as it was, is harmless. The IBLA reached its own conclusion as to the propriety of excluding the plaintiffs' leases from their respective units based on an evidentiary record, which includes extensive scientific analyses, assembled by an unbiased ALJ. Absent any claim that the ALJ's findings are unreliable or inadequate, "any improper motive or influence which may have affected the [Regional Director's] decision [has been] effectively removed by the IBLA's *de novo* review of the record." *Sierra Club v. Hodel*, 737 F. Supp. 629, 638 (D. Utah 1990). Having no basis to believe that the IBLA's decision has prejudiced the plaintiffs, the Court DENIES their Motion for Summary Judgment and GRANTS the Defendants' Cross-Motion for Summary Judgment.

RICHARD J. LEON
United States District Judge

20